RAUL PESCHARD, SR., V. THE STATE.

No. 20499. Delivered June 21, 1939.

The opinion states the case.

*W. H. Fryer* and *J. L. Dunigan,* both of El Paso, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

KRUEGER, Judge.

The conviction is for aggravated assault. The punishment assessed is confinement in the county jail for a period of one year.

The only question presented for review is the sufficiency of the evidence to sustain the conviction.

The record shows that upon his trial, appellant waived a jury and submitted all issues of fact and law to the court, which resulted in his conviction as above stated.

It was the State's theory that appellant became angry at his daughter because she spent some of her wages for a pair of shoes and he burned her with a blow torch. The defense was that the torch exploded, throwing burning gasoline upon her. This is a rather close case on the facts. Hence we deem it proper to make a more extended statement thereof than we would ordinarily do.

It appears from the record that appellant owned a general repair shop and was engaged in such business on the 11th day of February, 1939, in the City of El Paso. He was a married man, the head of a family consisting of his wife and seven children. The oldest child, Cristina, was a girl of sixteen at the time of the commission of the alleged offense,

and was employed at a laundry. She was required to turn over her weekly wage to her father. Prior to the day in question, she was promoted and received an increase in wages. Her employer having been theretofore informed that she was required to give her wages to her father, placed the excess or amount of increase in a separate envelope and gave it to her, placing her regular wages in another envelope to give to her father.

On the afternoon in question, she purchased a pair of shoes before she went to her father's shop to deliver the pay envelope. He noticed that she was wearing the new shoes and inquired of her as to where and how she had obtained them. She informed him that she had won them at a raffle, and he then demanded that she tell him the truth. She then admitted the increase in wages. She testified that at the time, her father was very angry; that his face was red. At the time, he had a blow torch in his hand, which was throwing off a blaze extending some four inches. We quote from her testimony omitting the unnecessary and immaterial parts thereof: "It appeared like he was trying to hit me. I backed up about two steps, turned my head sideways and then felt the flame. My hair was on fire. At the time I was burned, there was no gasoline burning in the cup, it was all burned up prior to the time I was burned. The flame was burning out the front and about six inches. The torch had been burning that way for about two or three minutes. There wasn't any more adjusting to do. The gas had completely burned out of the cup. Everything was working fine. The torch was throwing out a nice flame and he had it in his right hand before I was burned. My father was not burned. He was nearer the torch than I was."

She further testified "* * I heard my father tell my mother for her to say that I had burned my face with a heater—the kind of heater that I had been burned by is a small wooden heater."

Appellant's fifteen year old son, Eugenio, testified for the State in substance that he was present at the time of the unfortunate occurrence, and stated that: "I heard my sister yell and I turned around and I saw my father trying to cut off the flame. I saw my sister in flames and saw him trying to put the flames out. I did not see how she got in flames. My father's face gets red when he is angry. His face was kind of red. He was mad. There was some flames on the board where the gasoline had been thrown out. A board on the wall was burning; it was in the direction of her face. It was high up on the

wall. I got a bucket of water to throw on it, but could not reach it. My father dipped into the water, reached up and threw that water on it. I went after some castor oil to put on her face. When I came back, he was gone. Afterwards he returned with my mother. My mother asked me in the presence of father, why I had burned sister. I told her I did not do it; that father did it. My father did not say anything when I told mother that he did it. He looked like he was angry."

On cross-examination by appellant's counsel, he testified among other things as follows: "The last time I saw the torch my father was working on it; it was burning in the regular way—z z z z z. No, there was no flash or explosion of any kind."

Appellant testified in his own behalf. He denied that he intentionally burned prosecutrix. His contention was that he was working on the blow torch trying to get it in good working order. That he filled the cup underneath the spout with gasoline and lit it in order to heat the torch. That after the gasoline had burned out, he took a one-half gallon tank of gasoline and poured the cup full again. That it suddenly exploded and threw flames onto the girl. He testified that he immediately pushed the torch over on the work bench and extinguished the fire in his daughter's hair by covering it with his jacket. We find in his testimony this significant statement: "I don't know if any of the gasoline that splashed on the wall splashed on her. No, it didn't splash on me. At the time of the explosion, she pushed the boy to one side, trying to tell me she would explain to me. At the time she got close to me to tell me, and that was the time of the explosion. I pushed the torch away from me about a foot when it exploded. I had the half-gallon gasoline tank in my left hand. The explosion did not ignite the gasoline tank."

Appellant offered a few witnesses who testified as to his good reputation as a peaceful and law-abiding citizen. This would merely be a circumstance, however, to be considered in connection with his defense, and tend to show that he was not a man who possessed a character of such a nature as would commit the offense with which he was charged.

In reviewing the testimony, we must consider it in the strongest light from the State's standpoint. When we do so, we necessarily reach the conclusion that there was sufficient evidence before the trial court upon which he might base a judgment of conviction.

So believing, the judgment of the trial court is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.